By the Court—Robertson, J.
'The only questions of law raised in this case are, the refusal to grant a Jury trial, the exclusion of the plaintiff’s wife as a witness, and the admission of Mr. Selden’s account books as evidence.
The practice of Courts of equity in awarding issues in cases of fraud, or nicely balanced testimony, or the like, does not confer on either party an absolute right to a trial by Jury. Whenever a Court of equity felt the necessity of the practical aid of twelve men taken from the mass of the community, and accustomed to scan nicely the conduct of mankind in daily intercourse and constant multiplied transactions with them, from its less familiarity with discovering and weighing secret motives of action, and measuring the evidence of them as it appears in men’s ordinary conduct and conversation, it adopted such assistance, but not as an absolute duty to accept it. It is true, they found that in certain classes of cases such assistance was beneficial-, but I do not find any principle compelling a Court to avail itself of such assistance. It was, therefore, in most cases, a matter of discretion and not of right.
*492 But it is contended that the peculiar character of the claim here would have entitled the plaintiff to a trial by Jury before the adoption of the present Constitution of this State, and therefore he was entitled to it here. I do not find in the case that any objection was made to the trial of the issues without a Jury, at the time of such trial. The plaintiff offered his testimony, and the cause proceeded without objection or protest. The Constitution provides that a trial by Jury may be waived in such manner as the Legislature may prescribe. (Art. 1, sec. 2.) The Code of Procedure, in terms, only provides for a waiver by a failure to appear, by filing a written consent, or by oral consent in open court, entered on the minutes; but it has been settled that entering on a trial without objection is a waiver. (Greason v. Keteltas, 17 N. Y. R., 498.) If the plaintiff felt confident that he was entitled tó a Jury trial, he might have refused to appear; but having-taken the chance of a decision in his favor by a Jury of one, he must abide by the consequences. If the plaintiff had confined himself to an action for an accounting as to personalty only, he might possibly have been entitled to a trial by Jury, as a substitute for the action of account; but he has gone upon the equity side for relief as to real estate, and, having joined the two, has deprived himself of his right of trial by Jury. The very fact that he was entitled to different modes of trial as to the two different kinds of property would probably have entitled him to split up his cause of action into, two suits. (See Greason v. Ketaltas, ubi sup.)
In reg’ard to the admissibility of the plaintiff’s wife as a witness, the Legislature of this State, in 1862, (Laws of 1862, p. 858, § 31,) struck off the tag which had been fastened in 1860, to a previous amendment of section 399 of the Code, (Laws of 1860, p. 787, § 12,) under which attempts had been made to invade the sanctity of the domestic hearth, and introduce distrust by making husband and wife witnesses for and against each other. At *493 the time of the trial of this case in 1857, there was no foundation for any such rule.
The entries in the account books of Mr. Selden, upon an inspection of which the plaintiff determined the date of the instrument of 1844, and corrected or refreshed his memory, were admissible in determining what confidence was to be placed in his statement. In connection with the fact testified to by both parties, of his employment in drawing the instrument, and the production of the draft of a settlement prepared by him, corroborating thereby the defendant’s statement as to the purpose and contents of the instrument thus drawn, they were valuable adminicula of evidence. They were also regularly, although perhaps indefinitely, made in the ordinary course of business, by a-deceased person. Had they been very precise as to the contents of the documents, they might have been a subject of suspicion.
The legal objections being thus disposed of, it remains only to determine the questions of fact. The only real issue affecting the plaintiff’s right to affirmative relief, is the contents of the instrument of 1844, disposing of the profits of the business carried on by the defendant William B. Moffat, (hereinafter designated simply as the defendant.) The evidence in regard to all other matters is only important as shedding light upon those contents. The relationship of the parties, the defendant’s age, early education and career, the plaintiff’s pecuniary embarrassment, and bankrupt discharge, his transfer of his recipes to the defendant, and the consideration of such transfer, the interference or acts of both in the business in question, and finally their mode of life for seven years after such transfer, are only valuable so far as they furnish some probability in regard to such contents. In that view, they show either a secret trust in the defendant for his father’s benefit, out of the reach of his creditors, all that time conferring on the latter a right to a definite share of the profits or a mere claim of gratitude and filial affection, only morally binding on the son, but of so strong an influence *494 as to incline him, whenever requested so to do, to place his relations with the plaintiff, in regard to the support of himself and his family, on a more precise and definite footing. So, too, the transactions ot the months of June and July, 1854, between the parties are only important so far as they illuminate the transactions of ten years before, and determine whether the parties had been partners during the intervening time. They, in fact, either show a continuation of the same ready disposition by the defendant to provide by formal instruments for the liberal support of his father’s family, whenever required, or are a tardy recognition of the plaintiff’s legal rights as fixed ten years previously; and do reluctant and partial justice for endangering them by his destruction of the documents which created them, when confided to his filial care and fidelity, and that, too, only when wrung from him by the expostulations and denunciations of an indignant and outraged parent and benefactor.
Ho intendment can of course be made in favor of any person in reference to the contents of the instrument of 1844, by reason of their destruction by the defendant, except such person is proved to have been interested. The only proof of the plaintiff’s interest is his testimony, and perhaps that of Mr. Kissam, presently to be alluded to. If his testimony is more reliable than the defendant’s, we have sufficient positive proof of such contents without any presumption; if not, it would be established that he had no interest.
Both parties agree that the canceled instrTiment of 1844 was a disposition of rents and profits. The only questions respecting it were whether it was absolute or conditional, and.for the benefit of the plaintiff or of his family. Within a month before it was executed, the plaintiff had executed a new assignment, in place of a lost one executed seven years before, of the secret and recipes, whose use was to form the subject of the intended business. By the rentals in that, it appeared that the defendant had thus far furnished the “ reasonable sum *495 for the support of ” his father and his family so long as he gave his services in carrying on the business which was the consideration for the original assignment. Upon that, the defendant was bound by an implied covenant to furnish that support so long as the plaintiff gave such services ; but the death of the latter would put an end to the obligation. It would, therefore, have been a matter of some consequence at any time to place the support of the family beyond the reach of such contingency.
The plaintiff could not have delayed a proposal to form a partnership, to that time, by reason of his pecuniary embarrassments, since he had been discharged two years before; just after which he took from the defendant a power of attorney, and acted under it as his agent for nearly a year, while the latter was abroad. The plaintiff, during that time, never applied to the defendant either to form a partnership or make a formal provision for his family, in case of an accident to the defendant in his stay abroad. Nor were any arrangements made, or any application to the defendant, for any fixed provision for his father or his family, for two years afterward, until September, 1844. On the first of that month his father executed the second assignment before mentioned, trusting the support of himself and his family to the obligation contained in it. On the seventh, the defendant executed his will, in which he provided solely for his father’s family, which was read over to the plaintiff when the October instruments were executed. In the same month (September) the jfiaintiff, as he testifies, apjfiied to his son to make some provision for his mother and sisters. He was himself then laboring under a dangerous and alarming illness, from which he seemed likely to die, having been confined to the house since May previous, when he met with a serious accident, and was so reduced and weak as to be confined to his bed, and unable even to receive and hold the paj)ers then executed. While he remained in that condition, on the eighth of the next month, (October,) the defendant executed a deed of trust of two houses in Broad *496 way (371 and 375) to a trustee, in trust for his mother during her life, and after her death for her husband, with power to him first, and in case of his default, to her, to appoint three undivided fourths of them among the other children of the plaintiff, conforming in that respect to the will of the defendant, made in September previous, except that in case of his surviving his parents, he, by that, disposed of all his property in trust for his sisters. At the same time, and on the same occasion, the instrument in controversy was executed and delivered. The plaintiff testifies. that both those documents, after being executed, were delivered by the counsel who drew them, not to him but to his wife, with the direction to take care of them, because they were valuable to her.. She locked them up in her bureau. They never were recorded. The plaintiff never saw them or. inquired for them for two years, when he proposed to'put them in his son’s custody. He neglected then to inquire after them for eight years; no change having taken place in their mode of life, each party taking, as before, what money they desired from the profits of the business, no entries being made, and no accounts stated, rendered or required of the partnership. The defendant resided with the plaintiff, and the latter supported his whole family from the profits without an account. When informed of the destruction of the supposed partnership agreement, the plaintiff only remarked that the defendant had no right to do it; it was a saucy thing for him to do, although he had accused him the day before, in reference to the destruction of the deed of trust, of an attempt to defraud his mother and sisters as well as himself, (the plaintiff.)
Upon this state of facts, the question presents itself, whether the instrument disposing of half of the profits of the business for some time was for the same purpose and of the same character as the deed of trust executed simultaneously or not. Did it make the plaintiff a partner with the defendant, or assign such profits to provide for his family ? So far as the plaintiff’s right to any relief is con *497 cerned, it depends upon that question, the duration of the appropriation or its conditional character only affects the extent of that relief. The condition could, in fact, only bear upon the right to destroy, as the right of action would be in Mrs. Moffat and her daughters.
I do not understand the plaintiff as undertaking to testify that any transfer of the capital stock in the business was made to him in the agreement; he says expressly that nothing was said in it about capital, which he attempts to explain afterward as meaning money. So, too, I do not understand the defendant as testifying that any condition that such instrument and deed were to be void if his father lived five years, was embodied in either instrument then executed.
The plaintiff claims, in his complaint, that lots Hos. 371 and 375 Broadway were agreed to be conveyed to him at the time of making the partnership agreement, and were in fact so conveyed to him; that the partnership profits were invested in land, whose title was taken in the name of the defendant, but whose rents and profits were carried into such partnership business; that the defendant had always recognized his equal interest in the real estate. Thus making it appear that it was an absolute conveyance to him. So, too, as he stated on his examination as a witness for himself, he applied to the defendant merely to settle their business and divide their property before his marriage, to prevent auy difficulty in getting the wife of the latter to sign. And again, after the defendant’s marriage, he, the plaintiff, without specifying what it was, demanded the rest of his property, after he had obtained a deed to himself of Hos. 371 and 375 Broadway. In all this he made no mention of the interest of his family under the deed of trust of 1844, but claimed the profits as his own, except when he charged his son with trying to cheat that family. He clearly was not entitled to .any gains made out of the rent of that property if the settlement was valid and unconditional.
But in fact the plaintiff never called for a,ny accounting. *498 If the trust deed of 1844 was unconditional, neither party-had a right to use the rents of the houses in their partnership business at any time. The absolute deed to the plaintiff was a violation of the rights of the wife and children, only to be repaired by his making a settlement upon them precisely similar to that in the missing deed of trust.
The plaintiff, since 1844, was examined as a witness in three different suits brought by the defendant, and testified to his own want of interest in the business since 1837. In the first, (which was against one Lace,) he testified, in 1846, that he had no interest in the business carried on at 335 Broadway, (the defendant’s place of business,) or in the event of that suit; and that he had sold out all his interest to his son in 1837. In the second, (against one Green,) he testified that the defendant was (then) engaged in business on his own account solely, and was not connected with any other person in prosecution of such business, and that he (the plaintiff) was not interested in such business. In the third, (against one Phelps,) he testified that since March, 1837, he had had nothing to do with such medicines, and had no interest therein or in the sale thereof to the defendant in such suit. As such actions referred to transactions before 1844, the plaintiff sought to explain his testimony, not very satisfactorily, however, as being only intended to apply to such transactions, although his expressions were general.
The testimony of Mr. Kissam, who drew the instrument in question, does not aid .us a great deal in determining its contents. He says he drew certain deeds and articles of copartnership between the parties, executed in the fall of 1844. “ There was an agreement for a partnership—or “ joint business—between the parties. He Itnew nothing “further of it, than that it was betiveen them. He did not “ recollect its duration or the interest of either, except that “ the business was to be carried on in the name of the “ defendant; the plaintiff was to be a silent partner. He “ thought it referred to a business already established; *499 “ the profits were to be shared between the parties; the pro- “ portions he could not recollect.” On his cross-examination he stated that, according to his best recollection, such agreement was “made as part of an arrangement “ between the plaintiff and defendant, by which there was “ to be a provision made for the family, or heirs, or next of “ Icin of the plaintiff, in the event of his death, out of the “property of the defendant.”
From this last testimony it is very plain that the agreement in question could not have been one which would have terminated with the death of the plaintiff, as a partnership agreement would have done. It is also in the highest degree improbable that a partnership would have been formed by the defendant with a person in the condition in which the plaintiff then was, or that the latter would have desired to form one. If it referred to the profits, therefore, at all, it must have been an assignment or covenant to pay absolutely some part of the profits to the plaintiff for some purpose, which was the support of his family. The plaintiff's case is based wholly upon a partnership, not an assignment interest; failing that, his complaint should have been dismissed.
The paramount and insuperable difficulty in the plaintiff’s whole case, is that in his account of the transaction which takes the provision from his wife and children and vests it in himself, he is unable to assign any reason or motive for forming a'partnership in October, 1844, which would not apply with equal or greater force before; or to explain why he formed one when in so precarious a condition of health; besides that, he does not state why he allowed the only copy of an executory agreement to remain so long uninquired after in the hands of the party by and with whom it was made; why he never called for any account or settlement until the term of the partnership, as he states in his complaint, had expired, and why, even then, he only asked for a division of real estate. He acted neither as a confiding parent nor as a partner anxious to guard against accidents. In the plaintiff’s com *500 plaint against the defendant, in the action brought in August, 1854, he states that in 1844 and for several years previous, the business of preparing and vending the medicines in question had been carried on by him and his son, in the name of the latter, but for their joint and equal benefit, and that sometime in that year articles of copartnership, making it thus* a mere continuation, were signed by them. In this action the plaintiff states in the complaint, that he and his son entered yito a partnership agreement “/or certain good and sufficient causes and con- “ siderations them thereunto respectively moving.” On his examination as a witness he was unable to give any reason why he had never claimed any interest in the business from his discharge in bankruptcy to the autumn of 1844, and yet ask for it then. The only reason he assigned was confidence in his son; but he did not allege any loss of that confidence, or any impending event that might render a partnership useful or desirable with one in whom he had lost confidence. When the defendant went abroad in 1842, his father acted under his power of attorney without asking for any permanent interest. The plaintiff’s statement, therefore, is simply reduced to this: for seven years he confided in a son and in his undertaking to support him and his family; so much so as not to ask to interfere in the conduct of the business or to share in the profits as part owner; suddenly, after two years’ release from pecuniary embarrassment, on occasion of his son’s making a provision for his mother and sisters out of the property he had accumulated, and as part of a general „ arrangement to provide for them, as testified to by Mr. Kissam, he asked and received from his son an agreement to take him into partnership for ten years, weak and prostrated as he was, which partnership was altogether likely to be speedily dissolved by his death. The defendant’s statements of the object and cause of executing the instruments, I cannot but think more consistent and probable.
Unless the destruction of the instruments of 1844 was willful and malicious, there is no room for the presump *501 tion usually indulged in against the destroyer. The prompt and frank avowal by the defendant, even according to the plaintiff, of their destruction, without equivocation or evasion, might not alone have saved him from the consequences of the crime of getting into his possession and destroying instruments to his prejudice. (People v. Call, 1 Den., 120.) The subsisting relations between the parties, the unvaried mode of life, the .unbroken confidence and affection, the- continuance of the same patriarchal plan of members of the family drawing from the same purse, as before, without an account asked or rendered, the restoration of the plaintiff to health, the provision against accidents by the defendant’s will, which remained unchanged, may naturally have induced the defendant to consider those old documents, which had not been inquired for for ten years, and under which nothing had been done, as useless. The plaintiff’s remark, when he discovered the destruction of the agreement, was too mild, if he thought the defendant meant willfully to destroy the evidence of his liability. The Court can hardly be expected to suspect what he did not. I think, therefore, that the destruction of such papers was not from intention, but a disbelief in their value; equivalent to an accident, and not raising any presumption.
But even if there were no extenuating circumstances to deprive the destruction of the papers in question of the character of a spoliation, the mere destruction or withholding an instrument will not always supply the absence of proof of its contents, or corroborate the evidence of an interested witness in regard to them. The presumption arising therefrom may, in some cases, determine the general character of a paper destroyed or withheld, or reduce to certainty what is equivocal, vague or uncertain, or complete what is imperfect; but it does not corroborate whatever the party prejudiced by tlie destruction may testify to be the contents. The document in this case omitted to be produced is stated by Mr. Kissam to have been one of several to provide for the defendant’s mother and sisters, *502 and is claimed to have been destroyed by the plaintiff’s directions. From its mere non-production we cannot presume that it was a partnership agreement with the plaintiff any more than any other kind of agreement.
The widely differing accounts of the transaction in June and July, 1854, between the parties, as given by them, and the degree of corroboration they severally receive from other evidence, are important in fixing their relative reliability as witnesses, and, of course, that of their testimony in regard to the contents of the instrument of 1844, and the right of the defendant to affirmative relief. The conduct of the parties and the nature of their intercourse at the interviews when the lease and annuity were discussed and executed, is particularly important. At that time the plaintiff, as he states, knew nothing of the non-existence of the deed of trust and the other instrument of 1844; he therefore did not doubt that he had the evidence of his rights as a partner; he also must have believed, as he states in his present complaint, that the term of the partnership had expired; he knew his son was to be married within a week, and forthwith demanded of him a settlement of their business and a division before the marriage. The delivery of a lease for life of a valuable house occupied by them jointly, and the annuity of five thousand dollars just before the marriage, ought naturally to have produced some confidence in the good intentions of the defendant after marriage, and to have induced a parent not to urge him on the eve of it abruptly to settle an account of ten years standing, if he believed him to intend to act honestly or fairly. A voluntary and cheerful acceptance of those papers would give color to the existence and continuation not only of that confidence, but also of the equally friendly mode in which the subsequent deed would probably be received.
If the plaintiff’s anger and suspicion, on the 30th of June, for the supposed evasion by the defendant of any accountability, be laid out of view, the suddenness of the former’s hurst of passion, immediately after the return of *503 the latter from his wedding tour, upon his frank avowal of having destroyed an unrecorded settlement of his property on his mother and sisters, ten years old, and not spoken of for eight years, during which time the rents of the settled property had, with the plaintiff’s knowledge, been risked in business, becomes inexplicable, particularly when we consider the previous relations, mode of life and mutual conduct of the parties. That storm of indignation and reproach becomes, in turn, equally necessary to account for the new deed to the plaintiff of the settled .property. The lawsuit of August follows swiftly the rupture on the 26th of July, growing* out of the defendant taking, in his own name, instead of his sisters’, a title he had promised to place in his father’s. That rupture is rendered imminent by the neglect of the defendant to transfer some other property to the plaintiff, the indignation aroused on the discovery of the loss of the deeds, and denunciation of th,e defendant after his marriage, and expression of dissatisfaction before. All this seems necessary to account for the rapid progress of alienation between a father and son who had lived together over a third of a century in amity. In one short month a son, living in harmony with his father, in a house bought by himself, and allowing the latter to take what he pleased from the profits of his busi- * ness, without stint or account, who refused scarcelycanything demanded, settled the house he lived in on his parents, and conveyed a valuable piece of property, is suspected of dishonesty, denounced as a cheat, broken with and brought into a court of justice by his father. The truth of the whole of that picture depends upon the plaintiff’s belief of the defendant’s sinister purpose in not arranging matters with him before the marriage, his exhibition of that belief in his demeanor towards him, and the degree of spontaneity in accepting the lease and annuity. The plaintiff alleges when those instruments were presented to him, although he admits they were read to him, that he exhibited considerable temper; that he refused to receive them; that he told the defendant he had no busi *504 ness to give him the lease of a house which he knew the plaintiff had as much right to as he (the defendant) had; also, that he never made any objection to any clause in the lease, and that there was but one interview. Mr. Burchard testifies there were two. interviews; that lie explained the papers to the plaintiff, who objected to a clause preventing him from conveying his interest without his son’s consent; that he took them away and made an appointment fgr next day; drew a new lease with the objectionable clause omitted; also a new annuity deed; called again with Mr. Jarvis, the commissioner; had them executed in the plaintiff’s presence, and delivered them to him; he heard no such remark as the plaintiff swears to, and evidently did not perceive any ill feeling; he even testifies to friendly conversation between the parties. Mr. Smith, who was present, perceived no unfriendly feeling, and Mr. Jarvis testifies to the explanation of the papers. The defendant’s testimony is also adverse to the plaintiff’s statement. The plaintiff’s treatment of the defendant on his marriage, his permitting him to return to his house, the continuance of friendly feeling, as evidenced by the letter of the 26th of July, are hostile to the plaintiff’s narrative of his conduct, in the interview of the 30th of June, unless he be of an irascible and impatient temper; if so, his statement of an interview in which it might be aroused, is greatly to be distrusted. But in all the plaintiff’s testimony there is not an expression of the defendant’s indicating an intention to do anything short of full justice; not a disrespectful word; not even an answer to the torrent of reproach on the discovery of the destruction of the deed of trust of 1844. He gave the plaintiff the new deed the next day. There is, therefore, no evidence in the case to sustain the plaintiff’s theory of his early discovery of the defendant’s endeavor to defraud him; his expression of dissatisfaction at it, and his having wrung the deed of 1854, or the other instruments, from him, by denunciations and reproaches. It is not necessary to furnish a theory to account for his mistake, if it be one; it is only necessary *505 to show that the defendant’s statement is more consistent with probability, and corroborated by other witnesses in material points.
I am fully satisfied, therefore, that the instrument executed in the fall of 1844, disposing of the profits of the defendant’s business for a limited time, in the midst of the plaintiff’s prostration by sickness, and alleged to be delivered to his wife as valuable to her, along with a deed of trust, as part of an arrangement for the support of herself and her family, was not a partnership agreement. In all other respects, I concur with the opinion delivered at Special Term, and subscribe to the reasonings.
I, therefore, am in favor of affirming "the judgment at Special Term, with costs.